MARTIN H. NEWMAN, as Administrator with the Will Annexed, etc., of WILLIAM NEWMAN, Deceased, Appellant, *v.* BENJAMIN H. ROTH and JEROME ROTH, Individually and as Surviving Executors of and Trustees under the Last Will and Testament of HENRY ROTH, Deceased, BENJAMIN H. ROTH and JEROME ROTH, as Executors, etc., of ROSA ROTH, Deceased, JAMES L. CAREY and NEWMAN & CAREY SUBWAY CONSTRUCTION COMPANY, Respondents, and HATTIE NEWMAN and Others, as Executors, etc., of HENRY NEWMAN, Deceased, Defendants.

Second Department, June 15, 1942.

*Adolph Feldblum* [*Louis E. Goldstein* and *Philip Feldblum* with him on the brief], for the appellant.

*Lloyd B. Kanter*, for the respondents.

JOHNSTON, J.   The action is to compel an accounting of moneys received, to impress a trust thereon to the extent of $95,809.32, with interest from August 6, 1926, and to direct payment of such sum to plaintiff.   The court dismissed the complaint on the merits, and plaintiff appeals.

The action is based upon a written agreement dated July 30, 1924.   Only questions of law are presented, the determination of which depends upon the interpretation of the agreement.   Before considering the agreement it will be necessary to state the facts preceding its execution.

Respondent Newman & Carey Subway Construction Company (hereafter called the Company) was organized in 1915 and obtained a contract with the city of New York for the construction of a section of the subway on Nostrand avenue, Brooklyn.   Henry Roth, Henry Newman, William Newman and James L. Carey owned all the capital stock of the Company in the following proportions: Henry Roth, 300 shares, or thirty per cent; Henry Newman, 350 shares, or thirty-five per cent; William Newman, 120 shares, or twelve per cent; James L. Carey, 230 shares, or twenty-three per cent.   The last three, together with one Benjamin H. Roth and one Jerome Roth (sons of Henry Roth and subsequently appointed the executors and trustees under his will), also owned all the stock in another allied corporation, Necaro Co., Inc. (hereafter called Necaro), in the following proportions: Henry Newman, 250 shares, or twenty-five per cent; William Newman, 100 shares, or ten per cent; James L. Carey, 150 shares, or fifteen per cent; Benjamin H. Roth, 250 shares, or twenty-five per cent; Jerome Roth, 250 shares, or twenty-five per cent.

Henry Roth financed the Company.   He advanced $250,000 to enable it to perform the contract with the city and also became a surety on the Company's undertaking to the city to guarantee the performance and completion of the contract.   Unforeseen obstacles arose which greatly increased the cost of doing the work.

Rather than cease or delay operations, Henry Roth agreed to advance to or obtain for the Company such additional capital as it would require from time to time in order to complete the contract with the city. Pursuant to this agreement he advanced to or obtained for the Company large sums of money. On July 15, 1918, Henry Roth died, but the trustees and executors under his will recognized his obligation to furnish the capital required by the Company and continued to obtain funds for it.

From the beginning of 1918 to July 30, 1924, Henry Roth and his estate advanced to or obtained for the Company and paid to banks in discharge of the Company's notes which he or his estate had indorsed a total of $798,411.10. With respect to this indebtedness, the trustees of Henry Roth (hereafter called the Roth Estate) took the position that the other stockholders of the Company, Henry Newman, William Newman and James L. Carey, had "agreed to repay to said Henry Roth, in the proportion that their stock in the Company bore to the Company's entire issued capital stock, their share of all sums secured and/or advanced by him." Their proportion of the stock was seventy per cent, so that in effect the Roth Estate claimed that they had guaranteed the repayment of seventy per cent of the $798,411.10 and, accordingly, as of July 30, 1924, were liable for $558,887.77. They denied any agreement to repay. They claimed their liability, if any, was limited to certain of the notes to which they had added their indorsement. Henry Roth or his estate was either the maker or indorser on all the notes for the loans procured for the Company from the banks.

For the express purpose of settling the dispute "as to the liability of and amount due" from the three individual stockholders to the Roth Estate, and "in order to avoid disputes and litigation" as to their liability to the Roth Estate, all the parties, that is, the Roth Estate, the Company, the three individual stockholders, Necaro and Benjamin H. Roth and Jerome Roth individually entered into the written agreement dated July 30, 1924, which is the basis of this action. In the agreement the three individual stockholders are described as "Guarantors." The following are the material terms of this settlement or guaranty agreement:

The guarantors acknowledge they owe the Roth Estate seventy per cent of the Company's total indebtedness of $798,411.10, but each guarantor is to be liable *only* for his proportionate part of such seventy per cent; that is, proportioned to his stock ownership in the Company "less any credits" to which each may be entitled by virtue of paragraph "Twenty-second" of the agreement, the essential provisions of which presently will be set forth.

This undertaking on the part of the three guarantors left to the Roth Estate the burden of thirty per cent of the total indebtedness of the Company to it, being the equivalent of its proportion of the stock which it held in the Company.

Without any of the credits mentioned in paragraph "Twenty-second," the liability of William Newman, computed on the above basis, amounted to $95,809.32.

The liability of the three guarantors to repay their proportionate amounts was, however, limited in two other important respects: *First*, their undertaking was to pay without interest; and *second*, each guarantor was to pay his indebtedness to the Roth Estate only by applying in reduction thereof one-fourth of all the dividends paid by Necaro upon his stock. As collateral security for the performance of their part of the agreement, the guarantors deposited with the Roth Estate all their stock in the Company and in Necaro.

The agreement provides that in the event of the death or total disability of any guarantor, one-fourth of his Necaro stock " shall' be forthwith transferred to and become the property of the Estate upon the giving by the Estate " to the personal representatives of such deceased guarantor or to him (in case he is totally disabled) " a release of the several obligations and liability of the Guarantor * * * to the Estate." The agreement further provides that if at the time of such death or disability the amount of the guarantor's liability to the estate be less than the value of one-fourth of his Necaro stock, then only so much of the guarantor's Necaro stock shall be transferred to the estate as will satisfy such reduced indebtedness.

As stated, the agreement specified that the respective liabilities of each of the guarantors were to be reduced by the credits to which they were entitled pursuant to the provisions of paragraph " Twenty-second " thereof. That paragraph contains the vital part of the agreement as far as plaintiff's present cause of action is concerned. As a result of unforeseen obstacles encountered by the Company in the construction of the subway and the resulting delays, the city of New York had withheld a certain percentage of the amount due the Company under the contract, and the Company had made claim against the city and the Interborough Rapid Transit Company and was about to bring suit for such retained percentages and also for damages. Except for these claims, the only other asset of the Company in 1924 was some $2,700 in cash. Paragraph " Twenty-second " accordingly provided that in the event the Company collected upon such claims, then " the amounts so collected, less any sum or sums which may be necessary to pay any indebtedness or claims due and owing by

the Company *to any creditor or creditors, other than the Estate,* and less any sums which may be paid on account of legal fees, expenses or disbursements, shall be paid over by the Company to the Estate and credited by the Estate as against the total indebtedness of the Company to the Estate * * *."

Paragraph " Twenty-second " then specifically provides that in the event the total amount collected for such retained percentages and damages exceeds the principal sum of $798,411.10, " or the amount to which it may have been reduced by any credits recovered," then the excess of such collection shall be credited to interest on the principal; and that interest shall be thus added only if there be such excess.

Subdivision " a " of paragraph " Twenty-second " provides that in the event the Company shall derive any money from any policy of insurance upon the death of any guarantor, then the Company shall turn over such money to the Roth Estate, which shall credit it against the principal, in addition to crediting the moneys which may be collected upon the claims against the city.

By subdivision " b " of paragraph " Twenty-second " the parties further stipulate that " In the event of amounts being received by the Estate through the collection of retained percentages, other claims against the City of New York, and/or the Interborough Rapid Transit Company and/or any part or portion of any policy of insurance on the life of any Guarantor, the proportions of the amounts to be paid by any Guarantor in the manner and only in the manner as hereinbefore provided, shall be calculated from the time of the receipt by the Estate of any such amount upon the balance remaining after deducting from the total indebtedness amounting to Seven hundred ninety-eight thousand four hundred and eleven and 10/100 ($798,411.10) Dollars, the amount or amounts so received by the Estate as the result of collections of such retained percentages, other claims or credits by way of proceeds of policies of insurance on the life of any Guarantor or Guarantors."

Thereafter, in December, 1925, William Newman died and his executrix, in August, 1926, pursuant to the agreement, transferred to the Roth Estate the title to one-fourth of the Necaro stock owned by him and received from the Roth Estate a release of the deceased's liability to it under the agreement.

In August, 1934, Henry Newman died. His executors, however, did not surrender to the Roth Estate one-fourth of his Necaro stock and, subsequently, the Roth Estate returned to the executors all of the Necaro stock originally pledged by Henry Newman as security for his performance of the agreement.

Pursuant to the agreement, Necaro paid to the Roth Estate from 1927 to 1932 dividends on one-fourth of the Necaro stock of Henry Newman and Carey which, with respect to Henry Newman, amounted to $50,000, and with respect to Carey, amounted to $30,000.

The Roth Estate also received $95,997.42 from the Equitable Life Assurance Society as the proceeds of a $75,000 policy upon the life of Henry Newman. Originally, in 1915, this policy had been issued for $100,000 and was payable to the insured's estate. Immediately after its issuance Henry Newman assigned all his interest in the policy to the Company. In 1920 this policy was surrendered and two new policies were issued — one for $25,000, which the Company transferred to Henry Newman individually, and one for $75,000, which the Company retained. In 1921 the Company assigned its interest in the $75,000 policy to the Roth Estate. The latter paid the premiums thereon from 1921 to 1934, the year of Henry Newman's death, the premiums amounting to approximately $57,000, without computing interest. The court below held that the proceeds of this policy are not a credit which is deductible from the guarantor's obligation to the Roth Estate, since under the express language of the agreement the credit from insurance policies upon the life of any guarantor was limited to policies " from which the *Company* shall derive any sum " of money, not the Roth Estate; and in that event only was the Company to pay the proceeds to the Estate for credit upon the Company's basic indebtedness to the Estate of $798,411.10, which would, of course, result in a proportionate decrease of the guarantor's collateral undertaking to the Roth Estate. While the literal wording of paragraph " Twenty-second " (subd. " a ") of the agreement seems to warrant this conclusion, I believe the result does violence to the intention of the parties at the time they made the agreement. At that time, apparently, the only insurance in existence with which the Company or the parties were concerned was this $75,000 policy. Unless the agreement was intended to cover that policy, it was senseless to incorporate in the agreement this provision with respect to crediting the proceeds of insurance policies upon the life of any guarantor. In any event, we are saved further consideration with respect to the proceeds of this insurance policy, for on the argument plaintiff's counsel withdrew any claim with reference thereto.

After the making of the 1924 agreement, the Roth Estate received, besides $80,000 in dividends on the Necaro stock of Henry Newman and Carey, the following payments:

| | |
|---|---|
| $20,000 00 | in July, 1925, from the Interborough Rapid Transit Company; |
| 986,864 95 | on June 12, 1935, from the city of New York, being the net proceeds, after the payment of counsel fees and expenses, of a judgment of $1,246,515.23 against the city of New York, which was affirmed by the Court of Appeals on April 23, 1935 (*Newman & Carey Subway Const. Co.* v. *City of New York*, 267 N. Y. 548); |
| 3,556 56 | on May 3, 1938, being the dividend received from the receiver of the Interborough Rapid Transit Company on the Company's claim against it for delays, etc. |
| $1,010,421 51 | total of credits on claims against the city and the Interborough. |

It is significant to note that defendant Benjamin H. Roth (one of the executors of Henry Roth's estate, one of the principal officers and directors of the Company, a stockholder of Necaro and one of the moving spirits in this controversy), in testifying as to the payments to the Roth Estate, read from a memorandum of payments prepared by him from the records of the Estate; and in this memorandum there was included, together with the cash payments mentioned above, the twenty-five shares (or one-fourth) of the Necaro stock received by the Roth Estate in 1926 from the executrix of William Newman. However, the amount, if any, at which this stock was taken in and credited by the Roth Estate, was not given. Therefore, besides the twenty-five shares of Necaro's stock received from the executrix of William Newman, the Roth Estate, in satisfaction of the Company's indebtedness to it of $798,411.10, received $1,010,421.51 as a result of the claims against the city and the Interborough and $80,000 as dividends upon one-fourth of Henry Newman's and Carey's stock in Necaro, or a total in cash payments of $1,090,421.51. While the value of the twenty-five shares of William Newman's Necaro stock does not appear in this record, in litigation resulting from a deficiency income tax assessed against the Roth Estate (*Helvering* v. *Roth*, 115 F. [2d] 239, 240), such shares, for the purposes of income tax, were valued at $19,305.35. Accepting this valuation, the total received by the Roth Estate was $1,109,726.86, or an excess of $311,315.76 over the Company's indebtedness to it. If the Roth Estate were entitled, as against the guarantors, to add interest to the Company's indebtedness, such interest would be approximately double the amount of such excess.

Subsequently plaintiff Martin H. Newman, a son of William Newman, deceased, after the latter's estate had been closed, obtained his appointment in July, 1939, as administrator with the will annexed, his authority being limited solely to the prosecution of this action, which was commenced on September 12, 1939.

On the facts presented plaintiff undoubtedly is entitled to some redress because the obligation of William Newman was limited to guaranteeing to the Roth Estate the repayment of $95,809.32, without interest, but this obligation was to be reduced by " *the credits* " to which the guarantors were entitled pursuant to paragraph " Twenty-second " of the agreement. As stated, under that paragraph the Roth Estate was required to deduct from the Company's indebtedness the amount collected from the city of New York and the Interborough " less any sum or sums which may be necessary to pay any indebtedness or claims due and owing by the Company to any creditor or creditors, other than the Estate, and less any sums which may be paid on account of legal fees, expenses or disbursements * * *." Any such credits would reduce proportionately the collateral undertaking of each of the guarantors. The net amount subsequently received by the Company from the city and the Interborough was $990,421.51. As far as the guarantors are concerned, since their total liability was limited to $798,411.10, without interest, the credits, by reason of the payments received from the city and the Interborough, discharged their liability. Hence, the payment made in 1926 by the executrix of William Newman, deceased, through the transfer of the twenty-five shares of the Necaro stock and the cash payments made by Henry Newman of $50,000 and Carey of $30,000 out of the dividends on their Necaro stock, were in excess of their liability under the agreement. In fact, it appears that the estate of Henry Newman did make a claim for his excess payment and his claim was adjusted. (*Helvering* v. *Roth, supra.*) While the record does not show that Carey made any similar claim, he is still actively associated with the Company and the present Roths and it is fair to assume that he suffered no loss by reason of his overpayment.

While plaintiff has an equally just claim for William Newman's excess payment, represented by the value of the twenty-five Necaro shares, he may not recover it in this action. The theory of his complaint is that the transfer of this stock in 1926 to the Roth Estate constituted payment of William Newman's guaranty of $95,809.32; that by making this payment the Company's indebtedness to the Roth Estate was correspondingly reduced and the Company as matter of law was bound to indemnify him; that he is a

creditor of the Company in that amount and, therefore, as the moneys derived by the Company from its litigation with the city and the Interborough were to be turned over to the Estate only after payment to all creditors of the Company, such moneys constituted a trust fund for the benefit of creditors and the respondents were obligated to pay the William Newman Estate, *as a creditor*, the sum of $95,809.32 before paying any moneys to the Roth Estate.

This theory is untenable for several reasons. A fair reading of the agreement as a whole shows that the guarantors were not to be deemed creditors within the meaning of paragraph "Twenty-second." The intent was that before the proceeds of the litigation and claims were turned over to the Roth Estate, the Company should pay all the expenses of the litigation and all creditors who became such in the normal prosecution of the Company's business. This is shown by the fact that although the Roth Estate was then, in effect, in the same class as creditors, it was specifically excluded as a creditor. The liability of the Company to it was fixed by the agreement at $798,411.10. Obviously no similar exclusion of the guarantors was made at that time because their status, in any view of the situation as it then stood, could not be deemed that of creditors. They, unlike Henry Roth and his estate, had parted with no money and their liability at most was contingent, depending upon the extent of the recovery from the city and the Interborough and other possible credits. Even if the language of paragraph "Twenty-second" be construed literally, the fact is that the William Newman Estate was not and is not a creditor. It did not pay the Company's debt. As I presently shall point out, its delivery of the Necaro stock was in the nature of security for the ultimate repayment of its proportion of the principal of the Company's debt to the Roth Estate. That entire principal was paid as a result of the litigation with the city and the Interborough. Hence, while the Newman Estate may be entitled to the return of its security from the Roth Estate, under no circumstances can it be deemed a creditor of the Company.

Assuming, however, that in 1926 the William Newman Estate when it delivered the Necaro stock to the Roth Estate became a creditor of the Company, the Company's obligation to indemnify the Newman Estate immediately arose. (Stearns on Law of Suretyship [4th ed.], §§ 280, 282.) In that event the plaintiff's claim would be barred by the Statute of Limitations, pleaded by respondents. The fact that the agreement permitted payment to creditors out of the proceeds of the litigation before payment of any part thereof to the Roth Estate could not, as plaintiff argues, operate to postpone the enforcement of plaintiff's right of indemnity

against the Company if the Estate of William Newman in fact became a creditor in 1926, when the executrix delivered the Necaro stock. That was a permissive provision which could not affect creditors' rights. Independent of the agreement, the proceeds of the litigation would have to be used to pay all creditors.

Apart from the defense of the Statute of Limitations, plaintiff's only means of obtaining redress upon his theory would be by obtaining a judgment against the Company and then commencing a judgment creditor's action under the statute (Stock Corp. Law, § 15; *Buttles* v. *Smith*, 281 N. Y. 226); or by bringing an action to set aside the transfer of the proceeds of the litigation as in fraud of creditors. Plaintiff cannot, by means of this action, obtain a preference against other possible creditors of the Company.

Respondents' answer to plaintiff's theory is to admit that William Newman, by obligating himself under the agreement to the extent of $95,809.72, became a creditor of the Company and then to assert that he became a creditor "technically" only, because he assumed the obligation of a surety for the Company; that as a surety his remedy of subrogation to the rights of the creditor — the Roth Estate — cannot be invoked until that creditor has been paid in full; and that the Roth Estate has not been paid in full because under the agreement it is entitled to interest in the Company's indebtedness to it of $798,411.10.

The learned court below took the same view. This view, of course, is the logical result of the theory of plaintiff's cause of action, which makes the Company the principal, the Roth Estate the creditor and the three guarantors — Henry Newman, William Newman and Carey — the sureties. I cannot accept this view but, assuming respondents' premise as to the status of the parties, plaintiff in this action is not seeking to enforce any right of subrogation to the remedies of the creditor — the Roth Estate, as against the Company — the debtor. Plaintiff is seeking indemnity directly from the debtor by reason of having paid part of its debt to the creditor. It is not necessary for a surety to pay the entire debt in order to give rise to the equity of indemnity as against the debtor. (Stearns on Law of Suretyship [4th ed.], p. 508.)

Respondents also urge that, in any event, the delivery of the Necaro stock by the executrix of William Newman, deceased, was not a payment on account of the Company's debt, since payment was to be made only by the application of the dividends on such stock; and that the transfer of such stock upon the death of William Newman in exchange for a general release constituted merely a private settlement as between the Roth Estate and the William Newman Estate.

I cannot share this view. The agreement had settled all disputes between them. Primarily the delivery of the stock was a payment through a specified medium, in lieu of cash, upon the debt of the company. True, the Roth Estate agreed that the payment through this medium was to constitute a discharge of William Newman's obligation for his proportionate part of the Company's debt, but none the less the stock was given and accepted not as a release from the obligation of suretyship but in full satisfaction thereof — bearing in mind particularly that the extent of each guarantor's obligation was in fact unknown and unliquidated because of the credits to which they might and did subsequently become entitled.

While in my opinion the defenses urged by respondents to plaintiff's cause of action are unsound, there is no need to dwell upon such defenses because, as I have pointed out, plaintiff's cause of action is basically without legal foundation. Plaintiff is entitled to the return of the twenty-five shares of Necaro stock, or their value, from the Roth Estate, not because he became a creditor of the Company, but because under the agreement the relationship, essentially, of William Newman to the other two guarantors and to the Roth Estate was that of a cosurety. In other words, Henry Roth, the Roth Estate, Henry Newman, William Newman and Carey were cosureties for the debts incurred by the Company or on its behalf. While Henry Roth and his estate perhaps advanced directly to the Company large sums of money, yet a substantial, if not the major, part of the advances of $798,411.10 were made by other parties — the Title Guarantee & Trust Company, the Manufacturers Trust Company and the Mechanics Bank on notes executed by the Company and indorsed by Henry Roth or his estate, or on notes made by Roth or his estate but executed for the benefit of the Company. Of course, Henry Roth or his estate signed all these notes so that the estate considered itself the creditor of the Company. Actually, however, it became such because it met its obligation of surety or guaranty for the Company. Indeed, at all times both Henry Roth and his estate were adamant in their position that the other stockholders of the Company were equally responsible with them for a share of the Company's debt in proportion to their stock ownership in the Company. That responsibility, under the circumstances, could be only that of cosureties. That is why the 1924 agreement was made and that is why Henry Newman, William Newman and Carey were characteristically described as " guarantors." Essentially the four of them were the guarantors or sureties for the payment of moneys advanced to the Company even though the form of some of these advances

was such that the money was obtained by Henry Roth and his estate on their credit and thereafter delivered by them to the Company.

By the 1924 agreement the guaranty or surety obligation of Henry Newman, William Newman and Carey was expressly limited, however, to a total of seventy per cent of the Company's indebtedness of $798,411.10, *without interest*. The necessary result of this undertaking was that Henry Roth remained liable for thirty per cent of the Company's indebtedness, *plus interest* on the entire sum. This effectuated the intent of the parties, namely, to have each of the four stockholders in the Company bear in proportion to their stock ownership the burden of any default by the Company in the repayment of the principal of its indebtedness. Of course, while this effected an equal distribution of the risk as to principal, it still left the burden of interest to be carried by Henry Roth and his estate, except in so far as the agreement provided that in the event that the recovery from the litigation with the city and the Interborough (and credits from insurance policies) exceeded the amount of the principal indebtedness of the Company, then the Roth Estate was to be entitled to receive such excess in payment of the interest, but only in that event. Without this provision, however, the Roth Estate would have been entitled to interest under the rule of law which requires a principal to indemnify his surety for the loss sustained by the surety in paying the principal's debt.

As pointed out above, the extent of the obligation of the three guarantors as sureties was contingent, depending upon the eventual recovery from the city and the Interborough. The obligation of Roth and his estate as a surety, however, was not contingent but fixed, because they already had advanced or had become liable for definite sums of money given to the Company. Hence, the Roth Estate, at the time of the 1924 agreement, was already entitled to indemnity from the Company; and the primary purpose of the agreement was to diminish the ultimate loss in principal which might be suffered by the Roth Estate by having the other stockholders of the Company become cosureties only in the event the litigation with the city and the Interborough should be unsuccessful, or the proceeds thereof should be insufficient to indemnify the Roth Estate as to the principal of the advances made to the Company. This interpretation is supported, as already pointed out, by the quoted language of subdivision " b " of paragraph " Twenty-second " of the agreement.

The Company having been successful in recovering more than enough to pay the principal of its indebtedness, the contingent

liability of Henry Newman, William Newman and Carey as cosureties came to an end and they were under no obligation to make any payment to the Roth Estate. Whatever these guarantors or cosureties may have paid or delivered prior to the termination of this litigation by reason of their suretyship obligation was in the nature of security to guarantee that they would meet their suretyship obligation when or if it finally became fixed. Having discharged this obligation, it follows, therefore, that upon the final liquidation of the claims specified in paragraph "Twenty-second" (which occurred on May 3, 1938) they became entitled to the return of such security or advance payments.

It is interesting to note that the United States Circuit Court of Appeals, in the Second Circuit, took substantially the same view of the 1924 agreement, namely, that all the individuals and the Roth Estate were cosureties for moneys borrowed by the Company or advanced to it; that the payments made by Henry Newman, William Newman and Carey were contributions toward the principal on account of their obligation as cosureties; and that upon the payment of the entire principal of the debt by the debtor as the result of the litigation, the sureties were entitled to a return of their premature contributions on their suretyship undertaking. (*Helvering* v. *Roth, supra.*)

If the view of the minority be adopted, then plaintiff, instead of being made whole, would be making a profit at the expense of the Roth Estate. For the twenty-five shares of the Necaro stock, worth approximately $20,000, he would receive $95,809.32. This surely would be an unjust result and one never contemplated by the parties when they made their agreement in 1924. The intent of that agreement was, if possible, to make Roth and his estate whole as to principal and interest, and the agreement should be construed accordingly.

The judgment dismissing the complaint should be affirmed, without costs.

HAGARTY and TAYLOR, JJ., concur; CLOSE, J., with whom CARSWELL, J., concurs, dissents and votes to reverse the judgment and to grant a new trial, with opinion.

CLOSE, J. (dissenting). The agreement upon which this action is based was a compromise agreement settling a dispute that existed among these coadventurers and must be viewed in that light. Pursuant to the agreement, the plaintiff's testator guaranteed the payment of a portion of a debt owed to the Roth Estate by the Newman & Carey Subway Construction Company, which portion could not exceed the sum of $95,809.32 and might, under the

terms of the agreement, be less. The agreement provided that in case of the death of the plaintiff's testator any unpaid balance of the amount that he had guaranteed could be paid by delivering to the Roth Estate twenty-five per cent of the shares of stock that he owned in the Necaro Co., Inc. The agreement further provided that if the balance of the indebtedness of the testator should be less than the value of twenty-five per cent of his stock interest in the Necaro Company, such value being the book value without any item for good will, trade name or other intangible assets, then his indebtedness was to be satisfied by transferring such a percentage of his Necaro Company stock as would satisfy the lesser obligation. After the death of the plaintiff's testator his estate took advantage of the form of payment provided for in the agreement; and pursuant to the terms of the agreement, his liability was canceled. It seems clear that by accepting the stock in payment of the amount guaranteed by the plaintiff's testator, the debt owing by the Subway Construction Company to the Roth Estate was reduced by the amount of the plaintiff-testator's guaranty. In our opinion this agreement said in effect that twenty-five per cent of the stock owned in the Necaro Company by each one of these guarantors was equal in value to the proportionate share of the debt owed to the Roth Estate by the Subway Construction Company and guaranteed to the Roth Estate by each of the coadventurers. In other words, the agreement fixed the price at which under a certain contingency the stock of the Necaro Company could be turned over to the Roth Estate.

Under well-settled principles of law, when the plaintiff's testator paid the debt or a portion of the debt of the Subway Construction Company, he became a creditor of that company and became entitled to indemnification from the company, out of a certain fund, for the amount which he paid. (*Blanchard* v. *Blanchard*, 61 Misc. 497; affd., 133 App. Div. 937; affd., 201 N. Y. 134; Stearns on Law of Suretyship [4th ed.], §§ 280, 282, 289.)

Under the terms of the agreement the plaintiff's testator was entitled to have the benefit of the payments made to the Roth Estate through dividends on the Necaro stock credited on the total amount due to that estate from the Subway Construction Company. The Roth Estate's share of the guaranty was thirty per cent of the debt due to it by the Subway Construction Company. The other guarantors are entitled to an adjustment based on that theory. If this agreement be construed against its background of compromise, it is clear that the assets of the Subway Construction Company were set apart as a trust fund to pay its debts, and that this plaintiff has an equitable right to share in such fund. It is not denied

that the company's claim against the city was practically its only asset. It was from the proceeds of the successful prosecution of this claim that the coadventurers and coguarantors were to be reimbursed. The result here is inequitable and unjust and the judgment should be reversed and a new trial granted.

CARSWELL, J., concurs with CLOSE, J.

Judgment dismissing the complaint affirmed, without costs.