John D. Bennett, S.
In this intermediate accounting of an essentially poorly administered estate, the central theme has been a failure to encounter and resolve the conflicting claims between the estate and one of its executors, Maurice Goodman, whose financial dealings with the decedent, his executive secretary at the time, have left a tangled web of numerous transactions.
Mr. Goodman is characterized in his brief as having. once been a millionaire and his interests seem to have been primarily in securities and the investment world. He appears to have engaged-heavily in borrowing funds from numerous banks and pledging as collateral much of his stock.
Approximately a year before her death on November 8, 1962, the decedent married Irving Israel. During most of her employment by Mr. Goodman, however, she was known simply as Betty Blumberg. The relationship between Mr. Goodman and Betty Blumberg was obviously one of trust and confidence imposed in him by her as is evidenced by her letter of April 18, 1957 addressed to her brother in which she said: “ You can trust Maurice Goodman.”
*1037 The various issues raised by the objections and the claims both by and against Mr. Goodman have been divided into headings for clarification.

Title to stock in the name of the decedent.

Paragraph 10 of Mr. Goodman’s petition alleges that the stock listed in that paragraph in the name of the decedent was pledged by him for loans and that, when the stock is sold, the proceeds should be paid to the estate after payment of “ cost and interest charges.” The stocks listed are 200 shares of United Industrial Corporation, 42 shares of Emhart Manufacturing Company and 1,150 of Savoy Industries, Inc. This apparent concession of title in the petition was again repeated by Mr. Goodman’s counsel when he withdrew ariy claim by Mr. Goodman of ownership of the shares of stock. While it is clear up to that point that no claim of ownership had been made by Mr. Goodman to the shares of stock, the balance of the record reveals Mr. Goodman’s ambivalent position on ownership of the above-listed shares of stock and others that were pledged by him as collateral for loans made to him. At one point, Mr. Goodman’s counsel stated: “ There is no concession that this [stock] belongs to the Estate of Betty Israel. It may be in the name of Betty Israel.” When Mr. Goodman was asked why he had not sold the securities in the decedent’s name, which were pledged, he answered: “ Well, I didn’t have any particular urgency to sell them. The securities actually belong to me.
“ Q. You owned all the securities? A. I paid for the securities. ’ ’ Either Mr. Goodman claims he owns or. owned the stock beneficially notwithstanding their purchase in the decedent’s name or, more consistently with his pleadings, that the decedent owned the stock but may have borrowed the money from him for their purchase. His lack of candor and consistency only tend to cast suspicion on either position. Notwithstanding Mr. Goodman’s confusing stand on the question of ownership of the stock, the evidence adduced fully supports the conclusion that all of the stock in the decedent’s name and pledged as security for Goodman’s loans were owned by her. The first recorded evidence of an obvious course of dealing between Mr. Goodman and his executive secretary is his Exhibit 24, a letter addressed to him and on his stationery, signed by both the decedent and himself, which states in part: “I [Betty Blumberg] have received a total .of $7,388 cash advances and $1,422 equity, received for the purchase of securities.
‘ ‘ While I am indebted to you in this sum, you agree to indemnify me against any losses incurred resulting from the sales of said securities.”
*1038 There follows a listing of shared of various corporations. The second paragraph has obvious reference to Mr. Goodman’s practice of pledging securities in her name for his loans by its reference to his obligation to “ indemnify ” her against an^ losses incurred resulting from the sales of the securities. In addition, Mr. Goodman’s Exhibit 27, consisting of six books containing records of checks drawn on his account and deposits made, contain numerous notations from which it is clearly infer-able that checks payable to Betty Blumberg were loans made to her by Goodman for the purpose of purchasing securities. For example, the entries for checks numbered 801, 812 and 852 contain the decedent’s name as payee and the word “loan” followed in two cases by the number “ 100 ” and the letters ‘ ‘ BSF ’ ’, and in the third case by the number “ 50 ” and the letters “ BSF ”, having undoubted reference to the shares of BSF Corporation. While resort under the circumstances to presumptions is probably unnecessary, it is clear that ownership of stock is presumed to be in the registered owner (Miller v. Silverman, 221 App. Div. 697, mod. 247 N. Y. 447). On all the evidence, the court finds that the stock in the decedent’s name, which was pledged as collateral for .loans to Mr. Goodman, is owned by her estate as to those shares still held by the bank and that she also owned all other shares so pledged which have either been released or otherwise disposed of. The former group includes 200 shares of the United Industrial Corporation, 5% preferred; 101 shares of Emhart Manufacturing Company and 1,150 shares of Savoy Industries, Inc., presently held by Irving Trust Company as collateral for Mr. Goodman’s loans. As to other shares pledged and disposed of, 245 shares of BSF Company were sold on July 20, 1962, and 100 shares of Soss Manufacturing Company were released to Mr. Goodman on September 6, 1961, all before the decedent’s death.

Stock pledged as collateral for Mr. Goodman’s loans.

As indicated above, certain of the securities owned by Betty Blumberg are still held for Goodman’s loans. This was testified to by a representative of the Irving Trust Company and readily admitted by Mr. Goodman. When asked whether he had taken any steps to redeem the stock, he stated he requested their release at a very early date following her ■ death, but Mr. Sprafkin (the then attorney for his coexecutor) said it should not be done. At another point when again pressed on this subject he stated that he had requested counsel for permission to sell the stock “ but, that he had specifically asked me not to until the estate was settled because of the apparent dissension. ’ ’ *1039 In sharp contrast to these two statements, Bernard Blumberg, his coexecutor, testified that Mr. Sprafkin demanded that the stocks held as collateral for Mr. Goodman’s loans be released, but that absolutely nothing happened. The records of this court indicate that Bernard Blumberg in fact sought to commence a removal proceeding against Mr. Goodman as his coexecutor in June of 1964, part of the allegations being that Mr. Goodman had, in effect, declined to assist in releasing the securities pledged with the banks. Certainly, in view of Mr. Goodman’s obvious divided loyalty and self-interest in continuing the pledge, his attempt to shift the blame for nonaction to his coexecutor, or his former attorney, can be given little credence.
Had Mr. Goodman not been an executor of this estate and not been in a position of divided loyalty, what would have been the remedies for him logically to pursue to extricate the pledged securities? Betty Blumberg, Goodman and the banks shared the relationship of surety, principal and creditor (Vose v. Florida R. R. Co., 50 N. Y. 369; Restatement, Security, § 36; 53 N. Y. Jur., Secured Transactions, § 110; 57 N. Y. Jur., -Surety-ship and Guaranty, § 26; Stearns, Suretyship [5th ed.], § 2.1; Hagendorn, Suretyship, § 4). Among a surety’s rights there is that of reimbursement, exoneration, contribution and subrogation, each having its own peculiar elements (“Suretyship in the Uniform Commercial Code ” by Clark, 46 Tex. L. Rev. 453 [1968]). The remedies of reimbursement, contribution and subrogation are only available after the surety has paid or discharged the principal’s obligation and not before (Restatement, Security, §§ 112, 141, 149-164). However, even before any payment by the surety and after maturity of the debt, the right of exoneration enables a surety to commence an equitable action to compel the principal to discharge his obligation (Restatement, Security, § 112; Stearns, Suretyship, § 11.38; Spencer, Suretyship, § 177). This remedy has been held to include the right to compel the creditor to proceed against the principal where special circumstances are shown (Hayes v. Ward, 4 Johns. Ch. 123). In Thompson v. Taylor (72 N. Y. 32, 34-35), the Court of Appeals stated: “ These cases hold that, on the debt becoming due, the surety may go into equity to compel the principal to pay, and the creditor to receive payment; and that he may also, in equity, compel the creditor to proceed against the principal debtor for the collection of his demand, upon giving security and indemnifying the creditor against delay and expenses.” The language used by the court in Hayes v. Ward (supra, p. 132) is particularly apropos to the impasse which *1040 has resulted by reason of Mr. Goodman’s failure to take the kind of action the circumstances dictated. “ As early as the time of Lord Keeper North, (1 Vern. 190.) it was held, that equity would compel the principal debtor to pay the debt, after it had become due, at the instance of the surety, and though the latter had not been sued, for it was ‘ unreasonable that a man should always have such a cloud hanging over him.’ ”
Assuming the availability to this estate of the remedy of exoneration, it had the right to proceed in equity both against the principal and the creditor in an attempt to discharge the obligations and release the securities from the pledge (Killoren v. Hernan, 303 Mass. 93). It would appear, however, that the very person ultimately liable for these obligations has chiefly been responsible for the frustration in implementing any remedies.
It is well settled that a debt or obligation due from an executor is already deemed an asset in his hands (EPTL 13-1.2; Baucus v. Stover, 89 N. Y. 1; Matter of Shaefitz, 6 Misc 2d 704; Matter of Matheron, 207 Misc. 1061), and this is so even as to an unacknowledged debt (Hodge v. Hodge, 90 Me. 505), or one that is unmatured (Matter of Burdick, 79 Misc. 167, mod. on other grounds 161 App. Div. 907, affd. 212 N. Y. 553). The case of Hodge v. Hodge (supra, p. 509) contains an apt quotation: ‘ ‘ Where the same hand is to pay and receive money, the law presumes, as against the debtor himself, that he has done that which he was legally bound to do, and charges him with the amount as a debt paid.”
In addition, Goodman’s position as an executor and primary obligor for debts secured with estate collateral presented him with an intolerable conflict of interest that was completely irreconcilable with a continuance of that situation beyond a reasonable time for him to have sought the release of the stock from the bank. His fault lies in a complete failure to grasp the high .sense of loyalty required of an executor. 11 Executors or administrator will not be permitted, under any circumstances, to derive a personal benefit from the manner in which they transact the business or manage the assets of the estate.” (1 Story, Equity Jur. [13th ed.], p. 331). Executors must at all times exercise the utmost good faith and may never advance their own personal interests at the expense of beneficiaries (31 Am. Jur. 2d, Executors & Administrators, ■ § 216;- see, also, Restatement, Trusts, Duty of Loyalty, § 170).
While Goodman testified that he had offered to secure the release of the stock, it is inconceivable that such an offer would not have been accepted by his coexecutor or the coexecutor’s *1041 former counsel. As a conclusion to this perplexing situation, damages could be assessed against Goodman at present for any and all losses sustained by the estate by reason of his failure to do that which equity required him to do. Damages themselves, however, might prove to be an inadequate remedy without full knowledge of Mr. Goodman’s present financial condition and it would appear most advisable that any decree encompass a direction as to the stock itself. That would, however, require making the Irving Trust Company a party to this proceeding. Such a course appears the more desirable since the court would then have before it all the necessary parties and could make a full and complete disposition of the matter, including an ascertainment of the measure of damages to be applied as the result of any damages sustained by the estate (George Negri, Inc. v. Milford Constr. Corp., 15 Misc 2d 1029).
Accordingly, no direction is now made with regard to the stock presently pledged with Irving Trust Company other than that the executors secure the issuance of a supplemental citation directed to the bank to show cause why the stock held by it should not be released, and to effectuate service within 20 days of the date of this decision. Reference here should be made to the guardian ad litem’s assertion that the Irving Trust 'Company’s records indicate it is holding 187 shares of Emhart in the name of the decedent instead of 101 shares. While a card in Exhibit 1-A does refer to 187 shares, Exhibit 2, consisting of a group of bank records containing loan and collateral data, indicates that 84 of these shares (presently 101 shares) were owned by the decedent and 94 shares were owned by Goodman. Subject to further confirmation, it would appear that the bank holds only 101 shares of Emhart belonging to this estate. In addition, Exhibit 2 does not support the guardian ad litem’s claim that 225 shares of Colorado Springs Transportation Co., Class C, were ever owned by the decedent. Rather it indicates that such shares were in the name of a Sara S. Goodman.
The situation is entirely different, however, as to stock pledged for Goodman’s debts and sold or released prior to Betty Blumberg’s death. Mr. Stephensen, an assistant secretary of Irving Trust Company, testified and produced records of the bank showing a sale of 19,105 shares of BSE Corporation stock on July 19, 1962, 245 of which were registered in the name of the decedent. The entire proceeds were used to liquidate loans of Mr. Goodman as revealed in Exhibit 3. In view of Mr. Stephensen’s testimony, supported as it is by documentary proof, it is incredible that Mr. Goodman should have testified that the 245 of BSE Corporation were sold long before her *1042 death and the proceeds given to her. While there is no question of the validity of the pledge in view of the express letter .of consent signed by the decedent, dated November 11, 1961 (Ex. 1-A), this does not obviate the fact that in all surety-principal relationships the law implies a promise by the principal to the surety to reimburse him for all direct damages which the latter may sustain by reason of such relationship (Blanchard v. Blanchard, 201 N. Y. 134; Newman v. Roth, 264 App. Div. 344, affd. 290 N. Y. 559; Awad v. Universal Coconut Corp., 37 Misc 2d 211; Spencer, Suretyship, § 117). While this is a promise implied by law and in no way dependent for its existence on a contract or an express promise, Exhibit 24, referred to previously, lends support to the conclusion that such was the distinct rather than the presumed intention of the parties.
Accordingly, Mr. Goodman is charged with the payment of $2,082.50, being the proceeds of sale of the 245 shares of BSF Company stock owned by the decedent and applied towards liquidation of his debt, and judgment against him will be granted for that sum in favor of the estate, together with interest at the legal rate from July 19, 1962 to date of payment.
The only other stock owned by Betty Blumberg that appears to have been pledged for Goodman’s loans made by the Irving Trust Company was that of Soss Manufacturing Co. Mr. Stephensen testified that 100 shares of Soss Manufacturing Co. were released to Maurice Goodman on September 6, 1961, which was, of course, prior to the decedent’s death. Mr. Goodman testified, however, that the 100 shares of Soss Manufacturing Co. were never received by him, but were delivered to his office and received by Betty Blumberg. A receipt dated September 6, 1961 and initialled “ B.B. ”, indicating that 100 shares of Soss Manufacturing Co. stock in the name of Betty Blumberg and held as collateral for Goodman’s loans were received from the Irving Trust Company, lends credence to Mr. Goodman’s testimony. In any event, the letter of consent to pledge the 100 shares of Soss Manufacturing Co. stock, dated August 18, 1960, which is part of the same exhibit, gave the bank permission to release any property to her or Mr. Goodman, as her agent, or as he or she might direct. This would certainly appear to absolve the bank from any claim against it of mishandling the redelivery of the shares and since there is no evidence that Mr. Goodman somehow converted the shares to his own use, any claim with reference to these shares against him is dismissed. [Matter deleted as not necessary to an understanding of the opinion.]

*1043
Executors’ commissions and revocation of letters of removal.

The guardian ad litem requests in her final report that commissions for both executors be denied and that, in addition, Mr. Goodman be removed as executor and trustee and his letters revoked.
The previous observation that this estate was poorly administered is a considerable understatement. The complete indifference displayed, primarily by Mr. Goodman and to a considerable extent by Mr. Blumberg, to their duties as executors and the chronic delay in winding up this estate are apparent throughout the entire record. Neither of them has ever filed an account as executor except under compulsion. An account by Mr. Blumberg, filed on January 29, 1965 as a result of a compulsory proceeding against him, has been left in limbo since that date. No one, it seems, has had the best interests of the estate or the decedent herself primary or foremost in his mind. Under the circumstances, the court can see no occasion to reward this kind of conduct with commissions ordinarily paid and reserved for those who have done a satisfactory job. Neither of the executors will be allowed commissions (Matter of Simpson, 61 Misc 2d 307).
The additional request that Mr. Goodman be removed presents a more serious question. Since the courts are required to exercise the power of removal sparingly and to nullify the testator’s choice only upon a clear showing of serious misconduct that endangers the safety of the estate, it is not every breach of fiduciary duty that will warrant removal (Matter of Braloff, 3 A D 2d 912, affd. 4 N Y 2d 847; Matter of Burr, 118 App. Div. 482, 485; Matter of Berri, 130 Misc. 527). The mere fact that an executor has a claim against an estate or is involved in litigation with it (Matter of Woodworth, 165 Misc. 770, affd. 254 App. Div. 852) or is indebted to the estate (Matter of Tysen, 245 App. Div. 845) or is even in a position of conflict of interest (Matter of Weiss, 33 Misc 2d 773; Matter of Kent, 22 Misc 2d 66) does not justify removal. However, where a conflict of interest motivates the fiduciary to seek personal advantage and; gain at the expense and to the detriment of the estate, that will be sufficient to establish the propriety of his removal (2 Butler, Surrogate Law and Practice, § 1289, n. 28).
In the court’s opinion, Mr. Goodman’s acts or omissions demonstrate a lack of appreciation of the duties of executor and justify the conclusion that he has not been faithful to his trust and he is, accordingly, removed as executor and trustee and his letters revoked. It is well settled that an executor and trustee may be removed in an accounting proceeding without the for *1044 mality of commencing an independent proceeding directed to such relief (Matter of DeBeixedon, 262 N. Y. 168; Matter of Wohl, 36 N. Y. S. 2d 926). Similarly as in the case last cited, the question of the removal of both executors here was put in issue by the preliminary report of the guardian ad litem, which requested such relief and must he deemed to have been tried as part of the objections. In addition, SCPA 202 empowers this court to exercise any of the jurisdiction granted to it notwithstanding that the relief sought may be incidental to a different proceeding.
Although no removal of Bernard Blumberg is now sought in. the guardian ad litem’s final report, his conduct has done little to inspire any degree of confidence in his reliability for the future. In addition, the court notes papers filed by a trustee in bankruptcy of Bernard Blumberg. Under the circumstances, the court is of the opinion that, in order to insure the safety of this estate and pursuant to SCPA 710 (subd. 2, par. [b]) Bernard Blumberg should file a full bond as executor and trustee of this estate (Matter of Rosenberg, 165 Misc. 92).
Since the court has directed a supplemental citation to issue to the Irving Trust 'Co., this matter will, accordingly, appear on the calendar on the return day of that process. Following any hearings thereafter necessitated, the executors will be required to file an amended and updated account.