In the Matter of the Application of HERBERT BERRI, Individually and as Trustee under the Last Will and Testament of WILLIAM BERRI, Deceased, to Remove ROBERT F. R. HUNTSMAN, One of the Trustees Named in the Last Will and Testament of Said WILLIAM BERRI, Deceased.

Surrogate's Court, Kings County, October 7, 1927.

**Trusts — trustees — removal of testamentary trustee under Surrogate's Court Act, § 99, subd. 2 — facts do not show cause for removal.**

The purpose of this proceeding is to remove a testamentary trustee under subdivision 2 of section 99 of the Surrogate's Court Act. The trustee was appointed in the will of the testator to act as such. A large part of the testator's estate consisted of the ownership of all but one share of a corporation engaged in the publication of a newspaper. Prior to the testator's death the trustee was engaged by the testator as general manager of the New York office for the purpose of soliciting advertising and was paid a compensation of $100 per week and a commission on business secured. Upon the death of the testator the other directors of the corporation elected the trustee as president and a director in place of the testator. The advertising contract was renewed from time to time.

The principal charge against the trustee is that he was the principal factor in the administration of the estate and by reason of his directorship and presidency of the corporation was in control thereof and that during his administration of the corporation the assets thereof decreased approximately $34,000. Mere loss of money in the conduct of the business does not constitute a waste.

The position of the trustee as such and as president and director of the newspaper corporation and as advertising agent thereof was not so conflicting that his removal should be directed, since it appears that the trustee had no personal interest in the publishing company and was elected president and director thereof presumably because of the confidence reposed in him by the testator, and since it appears also that his salary as president was not more than the position warranted. Furthermore, the fact that he held an advertising agency contract does not require his removal as trustee, for his commission on that contract was for work done entirely outside of his duties as trustee.

The fact that an offer to purchase the newspaper and outstanding accounts for $400,000 was not acted upon was not due to any fault of the trustee but to the refusal of a cotrustee who was interested in the estate to accept the offer.

In view of the entire evidence no such misconduct was established on the part of the trustee as would show want of capacity or fidelity putting the trust in jeopardy and endangering the interests of the beneficiaries.

SPECIAL PROCEEDING brought by a trustee and legatee under the last will and testament of William Berri, deceased, to remove Robert F. R. Huntsman, one of the trustees named in the last will and testament of the said decedent.

*Leo Oppenheimer* [*S. H. Kaufman* and *Abel E. Blackmar* of counsel], for the petitioner.

*Alva W. Burlingame*, for respondent Huntsman.

*Edward J. Fanning*, special guardian for infants.

*Camp & Grier* [*J. C. Grier* of counsel], for Frederick H. Webster, cotrustee.

CHARLES H. KELBY, Referee. This proceeding to remove a trustee is brought under section 99, subdivision 2, of the Surrogate's Court Act. This section provides as follows:

" § 99. Removal, or revocation of letters for disqualification or misconduct. In either of the following cases, a creditor or person interested in the estate of a decedent, or a ward or a friend of a ward, or a person beneficially interested in the execution of a trust, or any surety on a bond of a person to whom letters have been granted or of a trustee may present to the surrogate's court having jurisdiction a petition, praying for a decree revoking those letters, or removing such trustee, and that the respondent may be cited to show cause why a decree should not be made accordingly:

" 1.   *   *   *

" 2. Where, by reason of his having wasted or improperly applied the money or other assets in his hands, or invested money in securi-

ties unauthorized by law, or otherwise improvidently managed or injured the property committed to his charge; or by reason of other misconduct in the execution of his office, or dishonesty, drunkenness, improvidence, or want of understanding; he is unfit for the due execution of his office."

The testator, William Berri, died April 19, 1917, and his will was duly admitted to probate on April 26, 1917. Letters testamentary on the last named day were duly issued to Robert F. R. Huntsman, George T. Musson and Herbert Berri, a son of the testator, all of whom had been named as executors and trustees under the said will. All of them qualified as executors and continued to act as executors until February 20, 1920, when they were discharged upon a final accounting as executors and turned over the properties then in their hands to themselves as trustees under the last will and testament of the said decedent. All three executors subsequently qualified as trustees. On January 22, 1925, George T. Musson died. George Haddon, named in the will of William Berri as the first successor of any deceased trustee, died February 14, 1925, and thereafter Frederick H. Webster was duly appointed trustee, pursuant to the terms of the will, and he qualified on the same day.

The last will and testament of William Berri, deceased, in paragraph 17 thereof, reads as follows:

" I hereby give my executors and trustees acting under this Will, full power and authority in their discretion to hold and retain any property coming to them under this Will in the same form of investment as that in which it may exist at the time of my death, although it may not be of the character of investments now permitted by law to Trustees. I also give to my said executors and Trustees full power and authority in their discretion to sell, mortgage, lease, exchange or otherwise dispose of any or all of my estate, real or personal, at their discretion, at such times or places and on such terms as they may deem advisable. I also empower my executors and trustees in their discretion to reserve from my residuary estate my home at 465 Clinton Avenue, in the Borough of Brooklyn, City and State of New York, for a period of time no longer than during the minority of my last surviving grandchild and that my executors in their discretion may permit my home to be occupied free of rent by any or all of my grandchildren and such other persons as my executors and trustees, in their judgment, deem wise for the purpose of maintaining it as a home and that while so occupied, all taxes, assessments, insurance, repairs and other cost of maintenance shall be paid from out of the income of my residuary estate."

34

Surrogate's Court, Kings County, October, 1927.    [Vol. 130

Prior to and at the time of his death William Berri was the owner of all the shares of stock of the Brooklyn Union Publishing Company except one share owned by John A. Halton. At the time of the death of Mr. Berri the directors of the company were William Berri, George Haddon and George T. Musson. The respondent Huntsman at that time was general manager of the New York office of the *Standard Union* under an advertising contract dated July 8, 1902.

At the time of Mr. Berri's death he was president and treasurer of the Brooklyn Union Publishing Company and also a director. His death created vacancies in those positions and accordingly, a little over two weeks after his death, the surviving directors, George Haddon and George T. Musson, held a meeting on the 14th day of May, 1917, and elected Robert F. R. Huntsman to fill the vacancy in the board of directors. Subsequently and at another meeting of the board called by Mr. Haddon, Mr. Huntsman was elected president of the publishing company in the place and stead of Mr. Berri, deceased. Mr. Musson resigned his position as assistant treasurer of the publishing company and was thereupon at the same meeting of the board elected secretary and treasurer. An annual salary of $5,000 was voted to the president, Mr. Huntsman refraining from voting on the resolution. Mr. Musson was voted an annual salary of $7,500 for his services as secretary and treasurer.

The main asset of the estate of William Berri, deceased, consisted of the shares of stock of the Brooklyn Union Publishing Company, which published the newspaper known as *The Standard Union*. The books of account of the publishing company were on a fiscal year business commencing May first of one year down to and including April thirtieth of the next succeeding year. The books for the fiscal year ending April 30, 1917, show accounts receivable of $95,195.43. By a subsequent entry made on April 30, 1922, the actual accounts receivable were increased $78,058.07 more than appeared on the books in 1917. Among the assets of the publishing company were New York Telephone Company bonds, Liberty Loan bonds and New York city bonds. Prior to Mr. Berri's death the practice had been to take any interest paid on these bonds and credit them as part of the purchase price of the bonds, so that upon the payment of the interest the value of the principal of the bonds was depleted by the amount of interest. The total of the assets of the company before these adjustments were made was $535,452.49. The total amount of the adjustments made on the books was $85,300.57, making total assets, after such adjustment, of $620,753.06.

The original item of liabilities shown by the books as of April thirtieth is $115,468.08. One of these items of liabilities was bills payable of $75,938.86. This item was never actually paid. This item of bills payable was written off subsequently. There was also an item of mortgages payable of $14,000 and a bond and mortgage interest account of $9,225.70, which was subsequently written off as liabilities on April 30, 1918. The former item was written off prior to that time. This would show revised liabilities as of April 30, 1917, of $16,303.52. This, with a revision of assets, would make the apparent assets as revised as of the books as of that day, $604,449.54. The capital stock of the publishing company as of April 30, 1917, was carried on the books as $219,500.

On July 8, 1902, Mr. Huntsman was, by written agreement, made the " general manager of the New York office of the Brooklyn *Standard Union*," and he was to pay all office expenses. This memorandum provided that " all inquiries for advertising rates for Manhattan are to be referred to him for his attention. He is privileged, subject to approval of the management, to solicit advertising generally for the *Standard Union*, and is to receive commission on all business he secures." The agreement further provided: " On New York advertising now in paper he is not to receive commission except on increase of business over previous year * * *." In compensation " as such New York representative Robert F. R. Huntsman is to receive a salary of $100 a week and also a commission of 10% on all new business from New York City, and on other business which he secures for the paper in excess of $1,000 a month." It further provided that Mr. Huntsman should not " act as representative of any other paper."

The following gross commissions were paid to Mr. Huntsman for advertising under this contract for the fiscal years ending April 30, 1915, $16,638.53; April 30, 1916, $17,138.89; April 30, 1917, $21,556.45.

Under a written contract dated March 17, 1920, between the Brooklyn Union Publishing Company and the O'Donnell Special Agency, Inc., the agency was granted the exclusive right for a period of five years to solicit throughout the United States " general and national advertising." All inquiries coming directly or indirectly from any source with respect to " general or national advertising " to the attention of the publishing company or information or rates on advertising in said territory should be promptly referred to the O'Donnell Special Agency. All " local advertising " in Greater New York outside of Brooklyn should be handled in the same manner. The agency was to be maintained at its own cost and expense and as compensation it was agreed it was to be

paid $100 a week and also a commission of ten per cent on all advertising business secured by the agency for publication in the *Standard Union* in excess of $1,000 a month. It was admitted that all of the stock of the O'Donnell Special Agency was owned by Mr. Huntsman and for all purposes of this trial the agency was to be considered as Mr. Huntsman.

On May 25, 1925, another contract was made between the publishing company and Robert F. R. Huntsman, Inc. This contract was substantially the same as the O'Donnell Special Agency contract except that it had a provision that if the publication known as the Brooklyn *Standard Union* was sold during the term of the contract, either the publishing company or Huntsman, Inc., on giving ninety days' notice, might terminate the contract. It was also admitted that for all legal purposes Huntsman, Inc., was the same as Mr. Huntsman.

The following gross commissions were paid to the O'Donnell Special Agency for the fiscal years ending April 30, 1922, $47,628.31; April 30, 1923, $53,984.45; April 30, 1924, $52,222.50; April 30, 1925, $51,089.59; April 30, 1926, $6,532.63, and to Robert F. R. Huntsman, Inc., $40,977.78.

It appeared generally that from 1922 to 1926 newspaper business was prosperous and advertising rates were raised. How much the rates of the advertising in the *Standard Union* were raised does not appear.

The main charge is that Mr. Huntsman was a dominating factor in the administration of the affairs of the estate and of the affairs of the publishing company and that during his administration the assets of the publishing company decreased in the sum of $73,157.30. Part of this depreciation was caused by the payment of two dividends amounting to $39,330, the actual decrease in the value of assets being $33,827.30. There was also paid, during this period, $18,002.78 for taxes. The securities owned by the publishing company, consisting of New York Telephone Company bonds, New York city bonds and Liberty Loan bonds of the approximate value of $179,000, at four per cent interest would produce an income of $7,000 a year. For the current years in question this would exceed $56,000.

Mere loss of money in the conduct of the business does not establish a *devastavit* of the estate. The paper was operated at a loss of $104,667.82 for the year ending April 30, 1926. During this time there was income of approximately $8,400 from the invested securities.

It is also charged, as a ground of removal, that Mr. Huntsman placed himself in a position where his personal interest came in conflict with that of the beneficiaries under the will and of the

Misc. 527]    Surrogate's Court, Kings County, October, 1927.

publishing company, and that he has derived a personal benefit therefrom in violation of his trust.

The petitioner takes the position that as Mr. Huntsman was a trustee under the will of William Berri, deceased, he should not have allowed himself to have been elected president of the company and should not have accepted a salary of $5,000 therefor; and also that his entry into the O'Donnell Special Agency contracts and the Huntsman, Inc., contracts placed him in a position where he could not act impartially as trustee. It is apparent that somebody had to be elected president of the publishing company. The surviving directors, after the death of Mr. Berri, elected Mr. Huntsman president. These directors had been chosen by Mr. Berri himself in his lifetime. No charge is made that these two directors acted in bad faith in causing the election of Mr. Huntsman as president. Nor is there criticism that the amount of salary paid is too much. The point is made that Mr. Huntsman should not have acted as president and received a salary. It will be noted that nowhere in the will of Mr. Berri is there any mention made of the Brooklyn *Standard Union* or of the publishing company nor is there any express direction that the publication of the newspaper should be continued after the death of Mr. Berri. The sole provision in the will which relates in any way to the Brooklyn Union Publishing Company is found in paragraph 17 of the will where the trustees were given full power and authority in their discretion to hold and retain any property coming to them under the will " in the same form of investment as that in which it may exist at the time of my death, although it may not be of the character of investments now permitted by law to trustees." The trustees of the estate, therefore, owning all but one share of the publishing company stock, had the right to hold that as an investment under the terms of the will. It must have been contemplated that so long as the stock was held by the trustees as an investment, proper action would be taken by the trustees to safeguard the value of the stock. Someone had to undertake the task of canvassing for advertising matter for the newspaper. During the lifetime of Mr. Berri this had been intrusted to Mr. Huntsman under the written contract hereinbefore mentioned. The practical question then necessarily presented itself to the directors of the corporation whether or not to continue the employment of Mr. Huntsman as an advertising solicitor for the paper or to engage someone else. The directors knew that Mr. Berri had complete confidence in Mr. Huntsman and had executed a contract himself on behalf of the newspaper to hire Mr. Huntsman for such purpose. It was quite natural, therefore, for the directors to re-engage Mr. Huntsman. There is nothing inherently legally or morally wrong in

making such contract.   While it is true that ordinarily the commissions allowed by law are deemed to be full compensation for the performance of services as a trustee, this is not an inflexible rule.   Where a trustee renders services outside of his duties as trustee he is entitled to fair compensation for the services rendered to the estate.   It was so held in the case of *Lent* v. *Howard* (89 N. Y. 169) and in *Russell* v. *Hilton* (37 Misc. 642).   In the latter case the opinion was written by Mr. Justice SCOTT, and it was then stated that if the executor in that case had not devoted his time to the duties for which it was sought to compensate him, it would have been necessary to have employed someone else to perform them; and the compensation of the person so employed would have been a legitimate charge against the estate.   In that case the executor was an architect and performed services as such architect for the benefit of the estate, which duties, of course, were not included in his duties as executor.   In that case, as in the case at bar, the architect had rendered services to the testator in his lifetime and the court pointed out that there was no good reason why the estate should lose the benefit of his services.   Here there was no express power or direction to the trustees directing them to continue the business.   Their sole power was to continue to hold the stock as an investment.   It is true that the commissions earned by Mr. Huntsman as advertising agent grew in amount from year to year.   Part of this increase was doubtless due to an increase in the rate of advertising.   How much of it was due to this cause alone does not appear in the record.   There is a tabulated statement in evidence showing the number of lines of advertising in the *Standard Union* for the calendar years of 1921 to 1925, both inclusive.   How this number of lines of advertising compares with the period prior to the death of Mr. Berri does not appear nor does the number of lines of advertising from the year 1917 to 1921 appear.

Upon the same subject criticism is made that Mr. Huntsman participated in a resolution of the board of directors reducing the price of the newspaper from two cents to one cent.   No doubt the main purpose in making this reduction was to increase the circulation, and thus render the paper more valuable to advertisers, and make it more easy to solicit advertising.   The hope of securing additional advertising was not, as contended by the petitioner, solely to increase the commissions of Mr. Huntsman but to benefit the paper itself and put it on a better financial standing.   The sole expert called by the petitioner gave it as his opinion that a reduction in the price of the paper was a mistake; was, as he expressed it, a short cut to secure increase in circulation.   He was of the opinion that it would be better to spend money in a campaign

to increase the circulation of the paper and keep the price at two cents, as formerly. If the amount of money to conduct such a campaign was not available, it appeared that the only other alternative was to sell the paper or stop the publication. It appears that an immediate result of reducing the price of the paper was to increase the daily circulation approximately 20,000 copies per day. I think this action was done in good faith by Mr. Huntsman and his associates and, therefore, do not consider it an act prohibited by the section of the Surrogate's Court Act under which this proceeding has been commenced.

Apparently any increase in commissions that were earned by Mr. Huntsman would be reflected in some increase in the revenue of the paper as his commissions were ten per cent.

Nor is the comparison of circulation and advertising with two other newspapers in the borough of Brooklyn a fair measure of the prudence in the management of the *Standard Union*. Unless there was some evidence to show the availability of additional capital that might be in the hands of the two competitors, and the cost of conducting a campaign to increase advertising and circulation by the rival papers, no proper comparison could be made.

Criticism is also made of the fact that a written offer to purchase the plant, circulation and good will of the paper and all of the assets, exclusive of the bonds, and the outstanding accounts receivable, for the sum of $400,000 was not acted upon in a satisfactory way by Mr. Huntsman as a trustee or as president of the publishing company. The terms of this offer, dated October 16, 1925, were communicated in writing to the trustees with the statement that Mr. Herbert Berri had the matter under consideration. Repeated efforts on the part of both Mr. Huntsman and Mr. Webster to have Mr. Herbert Berri confer with them personally were without avail. It is uncontradicted in the evidence that in the month of May or early in June, 1925, Mr. Herbert Berri declared " That the paper is not for sale at any price." He made the same declaration at a subsequent time and on still another occasion he directed that a message be conveyed to Mr. Webster, stating that the paper was not for sale at any price at that time. This was on the 28th of May, 1925. On still another occasion, April 15, 1926, he stated that he had an offer for $200,000 and " if it would go as cheap as that he would buy it himself." He said he had just turned down an offer of $400,000 for the paper. Before there could be a sale by the trustees of the stock of the publishing company the joint action of all three trustees was necessary. I can see no wrongful act on the part of Mr. Huntsman in this matter which would warrant a finding that what he did in the matter caused damage to the funds of the estate.

Surrogate's Court, Kings County, October, 1927.      [Vol. 130

It is not any misconduct or even a breach of trust which will justify the removal of a trustee. The power of removal is exercised sparingly by courts and will not be exercised unless there is a clear necessity for such drastic action. Only such conduct as jeopardizes the fund will induce the court to remove a trustee, particularly one in whom special confidence has been reposed by the creator of the trust. (*Elias* v. *Schweyer*, 13 App. Div. 336; Perry Trusts [6th ed.], §§ 276, 277.) Mere error or even breach of trust may not be sufficient. There must be such misconduct as would show want of capacity or fidelity in putting the trust in jeopardy.

The petitioner relies strongly upon the case of *Pyle* v. *Pyle* (137 App. Div. 568; affd., without opinion, 199 N. Y. 538). That case arose on demurrer to the complaint. The demurrer was overruled at Special Term and in the Appellate Division and the latter court allowed an appeal to the Court of Appeals on the single certified question: " Does the complaint state facts sufficient to constitute a cause of action? " The decision of the lower court was affirmed by the Court of Appeals. In that case the facts were quite different from those in the case at bar. The action was in the Supreme Court under section 112 of the Real Property Law to remove James Pyle as a trustee under the last will and testament of his brother, William S. Pyle. Prior to the death of the testator he and his brother were engaged in a profitable partnership in merchandising a product known as " pearline." Prior to the death of the testator they had entered into an agreement to incorporate the business in the event of the death of either. Mary Pyle, the testator's widow, and James Pyle, the brother, were named executors and trustees under the will and the residuary estate was given to them in trust for the benefit of the widow during her life, with remainder to the children. After William Pyle's death the business was incorporated and one-half of the stock of the corporation was given to James Pyle, and the other half to the widow and James Pyle as trustees of William Pyle, deceased, and the stock was so held when the action was commenced. James Pyle insisted, before he would consent to the incorporation of the business, that he be made president at a salary of $36,000 per annum. This demand was apparently acquiesced in by the widow for the time being, and later objection was made to his receiving such a salary; James Pyle consented to reduce it to $25,000, although the widow insisted that he should receive no salary in excess of $12,000. Then followed differences between James Pyle and his cotrustee with relation to the disposition of certain trust property and also the management of the corporation. In the *Pyle* case, James Pyle, the trustee, always owned personally a one-half interest in the stock and by merely disagreeing with

his cotrustee he could absolutely control all of the acts of the corporation. The particular act that the Appellate Division opinion criticised was that James Pyle in accepting a salary as president of the corporation, at the same time owning one-half of the stock and owning one-half together with his cotrustee, assumed a· position in which his personal interest in securing a salary and perpetuating his control of the corporation might come in conflict with his duty as trustee. The court said: " The appellant personally owns one-half the capital stock of the corporation, from which he is receiving a salary of $25,000 a year as its president. He and the plaintiff as trustees of his brother's estate own the other half. The disagreement which has arisen between the two trustees, in effect, disfranchises their stock, the plaintiff insisting on voting it one way and he the other, the effect of which is to give him the actual control of the corporation by virtue of the stock which he owns personally. By accepting a salary as president of the corporation he has placed himself in a position whereby his personal interest may or has come directly in conflict with and to a certain extent antagonistic to his interest as trustee."

In the case at bar Mr. Huntsman owns no stock in the corporation personally. His only interest in the stock is that of trustee. The salary voted to him as president of the corporation originally was enacted by a resolution by two directors who were personally selected by Mr. William Berri in his lifetime, with whose election as directors Mr. Huntsman had nothing whatever to do.

The case of *Munson* v. *Syracuse, G. & C. R. R. Co.* (103 N. Y. 58), cited by the Appellate Division in the *Pyle* case, was in accordance with a well-known principle that a trustee will not be permitted to purchase property from himself; nor to sell the trust property to himself; because, while he might act fairly, it is better that he should not be exposed to this temptation. That he might perform such a breach of trust and yield to temptation would hardly disqualify the trustee in advance.

In *Matter of Hirsch, No. 1* (116 App. Div. 367), also cited in *Pyle* v. *Pyle* (*supra*), the trustee was a practicing lawyer and grossly abused his position of trust for the purpose of securing an excessive salary as president of a business corporation and also an annual retainer as its counsel.

The matter of the lease of the premises in which the publishing company conducts its business presents no facts from which it might be inferred that the lease was improvidently made.

There is an apparent lack of harmony between Herbert Berri as trustee on the one part and Mr. Huntsman and Mr. Webster on the other. Mr. Herbert Berri has practically refused to perform any joint action with his cotrustee unless he may have his counsel

present at the meeting of the trustees and this refusal has largely contributed to the disagreement in the general management of the estate.

I am convinced, by a reading of the record, that Mr. Huntsman acted in entire good faith in all his actions with relation to the estate; that no personal action of his jeopardized any funds of the estate and that there are no grounds proven, therefore, to remove him under section 99 of the Surrogate's Court Act.

The proceeding is, therefore, dismissed, with costs. Submit proposed finding of fact and proposed conclusions of law on notice.