Charles D. Millard, S.
In the within intermediate accounting, objections have been filed by the Empire Trust Company, a creditor of the within estate. For the most part the objections relate to the continuance by the executrix of several enterprises conducted by the decedent to the time of his death.
The decedent died a resident of Westchester County on April 14, 1938, leaving a will dated January 27, 1936. Said will was admitted to probate in this court, and letters testamentary were issued to decedent’s widow as sole executrix, on May 11, 1938, Bankers Trust Company, named as a co-executor, having renounced. Among the assets owned by decedent at the time of his death was a winter residence in Florida and certain stocks and bonds of the approximate value of $40,000. Such stocks and bonds were pledged, however, with the Empire Trust Company as collateral security for loans made by it to decedent in the aggregate sum of $119,361.70. *133 In paragraph “ First ” decedent recited his residence in the State of New York and directed that his will be construed according to the laws of New York. By paragraph “ Third ” of said will, decedent bequeathed to his widow all furniture and household effects located in his Yonkers residence, certain other articles of personalty and all other personal effects owned by him wherever situated. After providing for the foregoing bequests, devising the Florida residence, and bequeathing the contents thereof, to his widow, the decedent devised and bequeathed the remainder of his estate in trust. Decedent’s widow is made the life beneficiary of one half of the income of said trust, and decedent’s son the income beneficiary as to a one-quarter share. One half of the principal allotted to the trust for decedent’s only child, Frederick W. Smythe, Jr., is payable to him upon attaining the age of 30 years and, upon his death, the remaining one half vests in the issue of said son, with provisions for substitutionary gifts in default of issue. In the event that decedent’s widow predeceases said son, leaving issue by a subsequent marriage, the trust for the son will be augmented by two thirds of the fund allotted to decedent’s widow, and one third thereof is to be paid to issue of such subsequent marriage. Should decedent’s widow die without leaving issue by a subsequent marriage, the share of Frederick W. Smythe, Jr., will be increased by nine tenths of the share allotted to the widow and. one tenth thereof is to be paid to one Jillie Sincel. Of the remaining five twentieths, two twentieths is to be held in trust for, and the income payable to, a brother of decedent during his life and, upon his death, to his daughter, if living; if not, to her issue. The remaining three twentieths is to be held in trust for a named niece of decedent during her life, and upon her death, the principal is to be paid to her issue. Decedent’s widow has since remarried. There is no issue of such marriage.
At the time of his death, the principal assets of decedent’s estate consisted of a substantial nursery business in Yonkers, New York, and Newport, Rhode Island, with retail florist stores in Newport and New York City.
Provision for the continuance of said enterprises is found in paragraph “Fourteenth” of said will, the pertinent portions of which read as follows:
“At the present time, my principal wealth is invested in the florist and nursery business. At my death, I authorize and empower my executors and trustees to take possession of my said business ventures and to conduct same along the same manner as conducted by me during my lifetime, over *134 such, period of time as they may deem advisable in order to liquidate, sell or otherwise dispose of my said business to the best interests of my estate and the beneficiaries thereof. * *
“ All operating expenses and operating losses of the said businesses are to be charged to them and not to the estate generally. All income accruing to the estate generally out of the said businesses shall be in the form of dividends from the corporations -$hich own the said businesses. * *
“ My executors and trustees are further authorized to continue my business ventures in the corporate or other form in which they may be at the time of my death, to reorganize said corporations or form new ones, consolidate corporations in general to change the corporate form or structure or to place the businesses in such corporate form or structure as they may deem to the best interests of my estate.”
On July 1, 1920, a corporation named Yonkers Nursery, Inc., theretofore formed for that purpose, took over the assets, assumed the liabilities, and commenced the operation of the florist and landscaping enterprises which had theretofore been conducted by the decedent under the trade names of Yonkers Nursery and Wadley & Smythe. On April 17, 1929, a corporation named Wadley & Smythe, Inc., was organized for the sole purpose of preserving the trade name of Wadley & Smythe, which had acquired some prominence in the florist trade. No assets were transferred to Wadley & Smythe, Inc., nor did this corporation ever operate the retail florist business.
At the time of decedent’s death the assets of Yonkers Nursery, Inc., consisted of considerable acreage in the city of Yonkers which had been improved by a large nursery. Upon this tract had also been erected greenhouses, store houses, superintendent’s houses and other buildings necessary to the nursery business, as well as the principal residence of the decedent.
Yonkers Nursery, Inc., maintained three retail florist stores in New York City which continued to be operated under the trade name of Wadley & Smythe. During the summer months a fourth retail florist shop was also operated by Yonkers Nursery, Inc., under the name of Wadley & Smythe at Newport, Rhode Island.
At the time of his death, the decedent held in his own name, seven parcels of property in Newport, Rhole Island, maintained in connection with the nursery business operated under the name of Newport Nurseries. This property was used primarily for the development of Yonkers Nursery stock, a portion of which was transferred to the nurseries at Yonkers *135 from time to time. Upon one of these parcels, referred to as ‘‘ Wyndelea ’ ’, the decedent also maintained a summer residence.
The stores in Manhattan provided a retail market for the nurseries at Yonkers, as did the Newport store for the nurseries at Newport. The decedent treated the enterprises in Yonkers, Newport and Manhattan as three separate entities. Each had its own system of bookkeeping and financing and each maintained accounts with the other two enterprises. The decedent received a salary of $10,000 a year as president of Yonkers Nurseries, Inc., and in addition thereto, for his personal funds had drawn upon all three accounts further amounts averaging in excess of $20,000 annually, for the three years immediately preceding his death. As above set forth, at the date of death the decedent was indebted to the Empire Trust Company in the principal sum of $119,361.70. To Yonkers Nursery, Inc., by reason of the- overdrafts for his own account, decedent was a debtor in the principal sum of $85,042.31, and to one Alfred C. Beaujean, an employee of Yonkers Nursery, Inc., decedent was indebted in the principal sum of $5,000. It was under these circumstances that decedent’s widow, also hereafter referred to as Mrs. Smythe, elected to continue the operation of, and to liquidate the enterprises in which the decedent had been engaged prior to his death, the coexecutor named having renounced, forthwith.
The issue which will first be considered relates to the propriety of the payment by Yonkers Nursery, Inc., to decedent’s widow of amounts totaling $21,450 for salary as an officer of Yonkers Nursery, Inc., for the period commencing May 1, 1938, and ending October 31, 1940. The proof established that on May 1, 1938, on electing to continue said business enterprises, the executrix was appointed to the offices of president and treasurer of Yonkers Nursery, Inc., at a salary of $750 a month for the 23 months’ period commencing May 1, 1938, and ending March 31, 1940, or at the rate of $9,000 a year during this period. For the remaining seven months, to October 31, 1940, she received a salary of $600 per month. On June 1, 1939, shortly before his marriage to the executrix, one Horace Griswold became vice-president of the Yonkers Nursery, Inc., at a salary of $6,000 a year, which continued at the same rate to the date of the last hearing held herein.
At one time prior to the death of the decedent, decedent’s widow, Mrs. Smythe, had been a director and the secretary of Yonkers Nursery, Inc., and had actively participated with her husband in conducting said enterprises. Since his death *136 she had, insofar as her experience and capabilities permitted, assumed the duties and performed the services theretofore performed by her husband, until June 1, 1939, when Mr. Griswold became an employee.
Previous to his appointment as vice-president of Yonkers Nursery, Inc., on June 1, 1939, Mr. Griswold had no experience in the florist or nursery business. Theretofore he had been employed in the shipping business and as secretary of a merchants’ association. To some extent the services thereafter performed by Mr. Griswold supplemented, and to some extent they duplicated, the duties which were then being performed or which had theretofore been performed by the executrix.
It is clear that this court has power to inquire into, and pass upon, the management of a corporation by a fiduciary to determine whether the acts of said fiduciary have resulted in a depreciation of the stock of such corporation, where all or a majority of such stock is owned by the estate. (Matter of Auditore, 249 N. Y. 335; Matter of Gerbereux, 148 Misc. 461.) A person who, as fiduciary, controls a corporate stock interest, is required to account as well for corporate affairs as for his other acts as a fiduciary. (Matter of Steinberg, 153 Misc. 339; Matter of Lieberman, 172 Misc. 1085.)
In considering the propriety of the salary payments made to the executrix herein, the court must necessarily also consider those made to Mr. Griswold, as the duties performed by each were necessarily interrelated to those performed by the other.
Although it is the general rule that a fiduciary who continues the business of a testator is not entitled to compensation in addition to his statutory commissions, compensation has been allowed for services in addition to those usually performed by a fiduciary. (Matter of Popp, 123 App. Div. 2; Matter of Davison, 173 Misc 323; Matter of Berri, 130 Misc. 527; Matter of Gerbereux, supra.) In Matter of Davison (supra), Surrogate Wingate summarized the holdings of the authorities on this question to the effect that “ extra compensation has been awarded where a fiduciary performs services in addition to those incidental to his office or imposed upon him by the terms of the will.”
The will of this decedent does not direct, but merely authorizes the executors and trustees herein to “take possession of ” and to “conduct ” such business ventures. Although the testator herein delegated to his executors and trustees the authority to continue such enterprises, this does not imply that *137 they were not to be continued or operated through the assistance and by the employment or under the direct supervision of persons other than such executors or trustees. The size and location of the enterprises and the magnitude of the task involving their continuance precludes such an assumption.
With the exercise of the authority granted to continue the enterprises followed the power to employ the persons necessary to perform the tasks incident to such continuance “ along the same manner as conducted ’ ’ by the decedent. Their continuance in such manner required that the vacancy be filled in the office of the presidency of Yonkers Nursery, Inc., caused by the decedent’s death. This corporation by its board of directors, other than Mrs. Smythe the names of whom do not appear, filled this vacancy by the appointment of the testator’s widow and fixed her salary originally at $750 monthly to April 1, 1940, and thereafter at $600 per month from then to October 31, 1940.
Moreover, the testator herein manifested an intent that the florist and nursery enterprises were to be operated not only as entities each separate from the other, but as well separate and apart from the administration of his estate, as such. There was here an intent that for some purposes the corporate entity was to be preserved. The permission to the executors and trustees to loan moneys to said enterprises from the assets of his estate, the direction that operating expenses should be charged to such enterprises and not to the estate, that income from such ventures should be in the form of dividends from the corporation, that the proceeds of sale of nursery stock should be regarded as operating income, together with the provision that the ventures should be conducted along the same manner as conducted by decedent during his lifetime, are all indicative of an intent that insofar as permitted the continuance of said enterprises was to be regarded as separate and apart from the administration of his estate. The will does not expressly prohibit the selection of decedent’s widow as an officer of Yonkers Nursery, Inc. Nor, under the circumstances here present, would the nature of the office of executor necessarily preclude an appointment of such fiduciary as an officer of a corporation even though the estate holds all of the stock of said corporation. On the contrary, unity of interest is among the factors that would tend to render such an appointment desirable, assuming the capability of the fiduciary named, to capably perform the duties of the corporate office. Any possible conflict of interest would arise only in the fixing of a *138 reasonable salary as compensation for the performance of such corporate duties.
The proof satisfactorily established that the experience and training of Mrs. Smythe was such as to qualify her as competent to perform such corporate duties. Even when she was not employed, she actively assisted her husband in the conduct of his business. Her contact with the business both as an officer of the corporation, and in voluntarily assisting decedent during his lifetime, gave her a knowledge of the operation of said enterprises and helped her form an association with its personnel which helped to qualify her to more capably perform the duties of the offices of president and treasurer. Accordingly, the court is of the opinion that the testator intended that the vacancy caused by his death in the office of president of Yonkers Nursery, Inc., should be filled, and that the services required to be performed by the person selected president and/or treasurer of Yonkers Nursery, Inc., to fill such vacancy were to be regarded as duties separate and apart from those rendered in an executorial capacity, whether by his widow or by the trust company named, either singly or by both as coexecutors. If this be correct the performance of the duties of such corporate office was not imposed by the terms of the will, upon either of the named executors who might qualify, and continue such enterprises. Under these circumstances, and the capability of decedent’s widow to competently perform her corporate duties having been established, there is authority for the payment of extra compensation for the additional services so performed. (Matter of Popp, supra; Matter of Berri, supra.)
Although no proof has been submitted on this hearing as to the fair and reasonable value of the services performed by the executrix, the testimony established that one time prior to the death of decedent, the executrix had been employed for a period of 18 months. For a time she had received a salary of $1,000 per month, an amount in excess of that fixed by the corporation for her salary as president after decedent’s death. Moreover, the salary fixed by the corporation for the services performed by the executrix was in an amount less than that received by the decedent for the corresponding duties performed by him during his lifetime. There was not such a conflict of interest as would prevent decedent’s widow from receiving fair compensation for the performance of her corporate duties, and that, in and of itself the payment of the amount of salary fixed and paid to June 1, 1939, was not improper nor the amount excessive. Accordingly, the court *139 will not disapprove such salary accruing or paid to Mrs. Smythe prior to June 1, 1939.
However, the payment of a salary at the rate fixed was not authorized after June 1, 1939, when Mr. Griswold’s employment as vice-president commenced. The enterprises were then being continued at a substantial operating loss, with a view towards liquidation. Under these circumstances, there was no justification for a substantial increase of operating expenses. So long as Mr. Griswold was being paid the sum of $500 a month for his services, the salary being paid to Mrs. Smythe should have been reduced by this amount. Accordingly, the executrix will be surcharged for the sum of $8,500 representing the amount by which the combined salaries paid to the executrix and Mr. Griswold between June 1, 1939, and October 31, 1940, exceeded the amount of salary fixed by the executrix for her services during this period, with accrued interest on such excess from the date of each payment. Except as hereinbefore indicated, the salary fixed and paid to Mrs. Smythe will be approved as reasonable.
Among the issues raised by the objections herein are those relating to the propriety of the purchase by the executrix, individually, of certain assets of Newport Nurseries and the continued operation of the Newport Nurseries business after October 16, 1939, as an estate venture. The property owned by the decedent at Newport, Rhode Island, consisted of seven parcels of land comprising approximately 153 acres. One of such parcels, known as Buffum Farm, a tract of 53 acres, was described as the heart of the nursery business. Upon this parcel had been erected several greenhouses and upon it was grown the best of the nursery stock. Buffum Farm was sold in December, 1938. By October 15, 1939, when the executrix, individually, purchased a parcel known as “ Wyndelea ”, a tract of 80 acres, all of the land owned by the decedent in Rhode Island had been sold, with the exception of the Vernon Avenue parcels, a comparatively small plot upon which there were some greenhouses and small nursery stock.
Related to the loss incurred in the operation of the Newport Nurseries is the purchase by the executrix, individually, of certain trucks and equipment used in connection with Newport Nurseries, and of the parcel known as “ Wyndelea ”. In the Rhode Island probate proceeding, “ Wyndelea ” and the buildings thereon were appraised at $36,250, the nursery stock at $3,186.50, the household furniture contained in the residence thereon at $1,000, and certain trucks and equipment at $2,113.50, a total appraised value of $41,549.75.
*140 With respect to the foregoing, the objectant contends first that the sum of $36,250 paid for the purchase of “ Wyndelea ” was inadequate, and that the purchase therof by the executrix was improper. It will be recalled that at the date of death, decedent was indebted to Yonkers Nursery, Inc., in an amount upwards of $84,000 and to the objectant Empire Trust Company in an amount approximating $119,000. The indebtedness to Empire Trust Company was thereafter reduced to approximately $48,000 by the sale of collateral held by it, from the proceeds of the Buffum Farm sale totaling $25,000 and by monthly installment payments made on account of said indebtedness. In October of 1939 the Federal estate taxes and various State estate taxes, approximating $43,500 had become due. At that time, substantially all of the personalty owned by the estate consisted of the stock in Yonkers Nursery, Inc., which could not be marketed. With the exception of “ Wyndelea ” and the Vernon Avenue property, all the Rhode Island real estate had been sold. Although “ Wyndelea ” had been listed for sale, no offers therefor had been received. Thereupon the executrix applied to the Probate Court in Rhode Island for leave to sell “Wyndelea” to herself, individually, for the sum of $36,250 and personally paid the expense of the sale of “Wyndelea”. As a result, the estate received cash which enabled it to make a substantial payment on account of said taxes. The purchase by a fiduciary, individually, of trust property, although viewed with suspicion, is not void but voidable. (Harrington v. Erie County Sav. Bank, 101 N. Y. 257.) The sale of ‘ ‘ Wyndelea ’ ’ to Mrs. Smythe, individually, was approved by the appropriate Probate Court in Rhode Island on notice to all interested parties. There being no evidence of bad faith, and it affirmatively appearing that it was necessary to liquidate some of the assets of the estate and that the amount of the purchase price was equivalent to the value as appraised, this objection is dismissed.
A further question is raised, however, with respect to the manner of payment of the sum of $36,250 made by Mrs. Smythe for the purchase of “ Wyndelea ”. Of this sum the estate received cash in the sum of $27,200. Of the cash paid, $14,523 represented the proceeds of a bank loan secured by a first mortgage on said property and $9,463.39 represented the proceeds of the sale of the Florida property hereinbefore mentioned, which had been specifically devised to Mrs. Smythe, and $3,213.61 represented a payment made by Mrs. Smythe from her own funds. The balance of the purchase price was paid by the delivery of a purchase-money second mortgage of *141 $3,550 executed by Mrs. Smythe, individually, to herself as executrix, and the execution and delivery of two promissory notes in the total sum of $5,500. One note in the sum of $2,500 evidenced an indebtedness of Yonkers Nursery, Inc., to Mrs. Smythe, individually, in that amount, representing moneys personally advanced by her to the corporation after decedent’s death, and was indorsed and delivered by her, individually, to herself as executrix. The second note, in the sum of $3,000 was the individual note of Mrs. Smythe payable to her order as executrix, and evidenced an amount claimed to be due her on account of salary for services rendered by her, after decedent’s death, and was indorsed and delivered by her, individually, to money second mortgage in the sum of $3,550 and the aforesaid promissory notes totaling $5,500 were then assigned and delivered by the estate to Yonkers Nursery, Inc., in cancellation of the estate’s liability to Yonkers Nursery, Inc., in that amount. These notes were then cancelled by Yonkers Nursery, Inc., in payment of these debts to Mrs Smythe. Yonkers Nursery, Inc., still holds Mrs. Smythe’s purchase-money second mortgage for $3,550.
By the execution and several assignments of said notes, the indebtedness of Yonkers Nursery, Inc., to Mrs. Smythe was reduced by $5,500 and the estate’s indebtedness to the corporation was reduced by a like amount. This phase of the transaction did not adversely affect the rights of any party to this proceeding.
By the execution and delivery of the purchase-money bond and second mortgage, Mrs. Smythe created her personal indebtedness to the estate in the sum of $3,550. By the assignment of said bond and mortgage in reduction of the estate’s indebtedness to the corporation in that amount, the corporation became the creditor of Mrs. Smythe. Ordinarily a fiduciary may not make a valid pledge of property of an estate as security for the payment of his personal debt. (Squire v. Ordemann, 194 N. Y. 394; English v. McIntyre, 29 App. Div. 439.) Here, however, the sale of “ Wyndelea ”, for the payment of a portion of the purchase price of which said bond and mortgage were given, was not only advantageous to the estate and made with judicial approval, but no attempt has been made to set it aside. Moreover, for all that appears, the value of the property is ample to secure payment of the mortgage debt. The law is well settled that the disposition of real property, whether by deed, descent or otherwise, is exclusively subject to the government within whose jurisdiction the property is situated. (United States v. Fox, 94 U. S. 315; *142 Deyo v. Morss, 30 App. Div. 56.) The Rhode Island decree authorizing the sale of said property has not been collaterally attacked in this proceeding. Under the holding in Tilt v. Kelsey (207 U. S. 43) since the Bhode Island court had jurisdiction of the res, its determination was prima facie conclusive insofar as it affected said realty. (Matter of Cummings, 142 App. Div. 377.) Under the circumstances, the court is of the opinion that no surcharge should be imposed in this proceeding by reason of this phase of the transaction.
With respect to the purchase by Mrs. Smythe of certain trucks and equipment of Newport Nurseries, the proof established that certain trucks and equipment on hand as of April 15, 1938, having an appraised value of $2,113.50, Avere sold to Mrs. Smythe, individually, during 1940 for the appraised amount. The accountant employed by the executrix filed a report herein in which it was stated that said equipment was in such poor condition when delivery was to be made to Mrs. Smythe, that there was delivered other equipment, which had shortly before been purchased by the estate, of the value of $2,041.75, resulting in a capital loss to the estate of $2,041.75. The conclusion is therefore inescapable that the executrix, individually, either purchased for $71.75 equipment OAvned by the decedent and appraised at $2,113.50, or purchased for the sum of $2,113.50 the old equipment appraised at this amount, as well as the newer equipment of the value of $2,041.75. The executrix has not satisfactorily explained this transaction and will, accordingly, be surcharged in the sum of $2,041.75, vdth interest thereon from the date of the delivery to the executrix, individually, of such equipment purchased by the estate.
Notwithstanding the sale of all the land at Newport, with the exception of the Vernon Avenue parcels by October 15, 1939, the Newport Nurseries business was continued by the executrix herein until April 11,1940, at a substantial operating loss after February, 1940, when the Vernon Avenue property was sold. There was no substantial reduction in the operating overhead of said business. Substantially all of the employees of NeAvport Nurseries were retained during the winter months and until April of 1940. The continuance of such enterprise at a loss Avithout substantially reducing operating expenses would ordinarily indicate only an exercise of poor business judgment upon the part of the executrix. However, most of the personnel of Newport Nurseries was subsequently re-employed by the corporation organized by Mrs. Smythe, to continue a nursery business through Newport Nurseries Corporation. The attempted explanation of the expenses charged *143 to the estate in the continued operation of this enterprise after October 15, 1939, brought the admission from the executrix that some of the expenditures for both labor and material were for her personal benefit and were improperly paid from estate funds. Under these circumstances, the court is constrained to find that the duties of Mrs. Smythe as executrix succumbed to her personal interests. Accordingly, notwithstanding the broad powers given to the executrix under the will to continue such enterprises, under the circumstances such continuance after October 15, 1939, was improper. The court finds that computed on an accrual basis there was a net operating loss of $2,524.27, incurred by reason of such unauthorized continuance of the business of Newport Nurseries after October 15, 1939. However, as the actual loss occasioned to the estate cannot be determined upon the proof before the court at this time, the fixation of the amount of such loss must await a further or final accounting herein.
The objectant also asserts that the executrix has failed to account for $2,023.90, representing receipts from cash sales made by Newport Nurseries prior to October 16, 1939. The executrix contends that this is only an apparent discrepancy and results from the erroneous assumption of the correctness of the opening figures of accounts receivable at the date of death, and the closing figures on such accounts receivable on December 31, 1940. The closing figure is conceded to be correct. The executrix asserts that the opening figure is inaccurate, due to the faulty records kept by the decedent; that the opening figure was arrived at by assuming an opening figure which is not supported by the records of the business. Any doubt as to the accuracy of the opening figure is removed by the letter of the accountant for the executrix, accepted as an exhibit, wherein the opening figure of accounts receivable as of April 15, 1938, is definitely fixed at $3,896.22, thereby fixing the amount of outstanding accounts receivable collected after April 15, 1938, for which the executrix has failed to account. The executrix will, accordingly, be surcharged with respect to this item in said sum of $2,023.90, with interest from December 31, 1940.
It will be recalled that the decedent at the time of his death owned real estate in Florida which was specifically devised to Mrs. Smythe. Ancillary probate proceedings which were instituted by the executrix in Florida, had not been concluded at the expiration of the period covered by the account. This property was sold by Mrs. Smythe for the sum of $9,463.39, and as hereinabove set forth, the proceeds thereof applied toward the *144 purchase price of the “ Wyndelea ” parcel by Mrs. Smythe, individually.
By objection “X”, payments totaling $1,101.39, set forth in the account as estate expenses, and relating either directly or indirectly to the Florida property, are claimed to be improper charges against the estate. Of this sum $164.14 represents payments for caretaker’s salary, for repairs and for similar expenses in connection with the Florida real estate over a period of not more than two months after the date of death. The sum of $280.75 represents payments made on account of Florida personal property taxes against decedent accruing during the four-year period immediately preceding the date of death. The balance of $656.50 is the total of the amounts stated to have been expended on account of taxes and water charges on said realty. It appears that all of such real estate taxes totaling $645.35 became due before the date of death. However, any applicable laws of Florida relating thereto have not been properly proven. As the disposition of real property is subject to the State within whose jurisdiction such property is situated (United States v. Fox, supra; Deyo v. Morss, supra; Matter of Van Zandt, 142 Misc. 663), under the circumstances, the determination with respect to the sale of the Florida property and the application of the proceeds thereof will be held in abeyance pending a further accounting when the court may properly determine whether the within estate is solvent or insolvent, at which time the court will dispose of said objections with respect to the Florida property and the propriety of the foregoing payments relating thereto.
All objections to payments covered by objection “ XI ” have been withdrawn, excepting only an item of $112.75 paid to Mr. Griswold as traveling expenses to Florida in connection with the Florida property. Determination as to this objection will likewise be withheld until a further or final accounting herein, at which time this objection will be passed upon in conjunction with the other objections to payments related to the Florida real estate.
Among the payments made by the executrix to which objections have been filed, are those made to R. A. McRoberts, totaling $1,638.22. The evidence establishes that these payments were made under an oral agreement with McBoberts whereby McBoberts, described as a financial adviser, was employed to liquidate the estate by attempting to sell the real property in Yonkers and other assets, or to obtain a mortgage loan sufficient to pay the debts of the within estate. McBoberts *145 was employed at the rate of $312.50 a month, and performed services during May, June and October of 1939, and July and August of 1940. Whether or not McRoberts had access to financial sources not available to the average real estate broker is unimportant. He performed no services of value to the within estate. No reason appears for a departure from the usual employment contract for the sale or mortgage of real property. The executrix will, accordingly, be surcharged in the sum of $1,638.22, with interest from the dates of the respective payments. For the same reason, the payment of $50 to F. P. Uffort, a mortgage adviser, was improper. The executrix will, accordingly, be surcharged in the amount of $50 with accrued interest.
The value of the Grassy Sprain Golf Club, Inc., bonds will be set forth in the amount of $600 instead of $6,000 and the account will be deemed amended accordingly.
The executrix will be directed to transfer from Rhode Island to this jurisdiction the sum of $559.85 with accrued interest, if any, and this amount shall be included as an estate asset in the summary statement of account herein. The sum of $59 owed by Mrs. Smythe to the estate, and shown on the books to be owing to Newport Nurseries, is hereby directed to be repaid to the estate. Said sum shall likewise be included as an asset of the estate and the account shall be deemed amended accordingly.
The objections filed are sustained only to the extent herein-before indicated. In all other respects such objections are hereby overruled and dismissed.
Proceed accordingly and settle decree.